UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-12121-GAO

RE/MAX OF NEW ENGLAND, INC., and RE/MAX, LLC,
Plaintiffs,

v.

PRESTIGE REAL ESTATE, INC., d/b/a LAER REALTY PARTNERS, STACEY ALCORN,
and ANDREW F. ARMATA,
Defendants.

OPINION AND ORDER
July 7, 2014

O'TOOLE, D.J.

## I. Background

For fifteen years, the defendants, Prestige Real Estate, Inc., and Stacey Alcorn and Andrew F. Armata (collectively "Prestige"), operated thirteen real estate offices under franchise by the plaintiffs, RE/MAX of New England, Inc. and RE/MAX, LLC ("RE/MAX"). Each franchised office had a separate franchise agreement with RE/MAX with separate expiration dates. The agreements for three offices expired by their terms, but the franchise relationship continued on a month-to-month basis under a provision in the agreements. The other ten offices were operating under active agreements at the time this controversy erupted.

On April 14, 2014, the defendants sent a letter to the plaintiffs purporting to terminate Prestige's relationship with RE/MAX for reasons spelled out in the letter, and asserting unfair business practice claims against RE/MAX pursuant to Massachusetts General Laws chapter 93A. The defendants started to do business as LAER Realty Partners ("LAER").

The plaintiffs commenced this action; the defendants have answered and counterclaimed. The plaintiffs have moved for a temporary restraining order, followed by a preliminary

injunction, requiring: (1) that the defendants cease and desist all use of RE/MAX's trademarks; (2) specific performance of the in-term and post-termination covenants against competition; and (3) specific performance of the defendants' obligation to assign telephone numbers and domain names to RE/MAX. The defendants contend that they are not using the plaintiffs' trademarks, the non-compete provisions are either inapplicable or unenforceable, the phone numbers do not belong to the plaintiffs, and the domain names have already been deactivated.

## **II.** **Legal Standard**

A preliminary injunction is "an extraordinary and drastic remedy." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012). Courts assess four factors when determining whether a temporary restraining order is appropriate: "(i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009). The first factor is generally considered the most important. Waldron v. George Weston Bakeries Inc., 470 F.3d 5, 8 (1st Cir. 2009). Indeed, "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Where a likelihood of success on the merits exists, the other factors need to be carefully assessed. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (analyzing risk of harm after finding a likelihood of success on the merits).

**III.    Discussion**

    A. Trademarks

In order to demonstrate that trademark infringement has occurred, the plaintiffs "must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008). The alleged infringer's continued use of the trademark is central to the inquiry. Boston Duck Tours, 531 F.3d at 34.

In this case there is no serious trademark controversy. The defendants have made clear that they do not wish to continue using the plaintiffs' trademarks. Boston Duck Tours established that *use* is a critical component of a claim for trademark infringement. The undated photographs submitted by the plaintiffs are unreliable evidence that the defendants are continuing to use the RE/MAX name and marks. The defendants, on the other hand, have invested in rebranding to a name and logo that bears no resemblance to RE/MAX. The plaintiffs have demonstrated neither a likelihood of success on the merits nor a prospect of irreparable harm.

    B. Non-Compete Covenants

A covenant not to compete is enforceable if it (1) is necessary to protect a legitimate business interest; (2) is reasonably limited in time and space; and (3) is consonant with the public interest. Boulanger v. Dunkin' Donuts Inc., 815 N.E.2d 572, 577 (Mass. 2004). Courts will not enforce non-compete provisions if their sole purpose is to limit ordinary competition. Lombard Medical Technologies, Inc. v. Johannessen, 729 F. Supp. 2d 432 (D. Mass. 2010) (citing Marine Contractors Co., Inc. v. Hurley, 310 N.E.2d 915, 920 (Mass. 1974)).

The plaintiffs rely on two different covenants not to compete: "in-term" covenants with respect to the ten franchises with unexpired agreements, and post-term covenants for the three offices operating month-to-month after the expiration of agreements.

1. In-Term Covenants

The standard in-term covenant, §5.F of the agreements, requires the franchisee to refrain from owning a non-RE/MAX real estate services business or affiliating with any other business that offers goods and services in competition with the plaintiffs.

The defendants argue that they are not bound by §5.F because they legitimately terminated all of the agreements as of April 14, 2014, when they sent the plaintiffs the Chapter 93A demand letter. Alternately they argue that the plaintiffs' unfair acts or practices and breach of the implied covenant of good faith and fair dealing effected a constructive termination of the agreements. The plaintiffs counter that the defendants had no right to terminate any of the agreements and are still bound by them. It is not possible to make a reliable assessment of either side's position on the current record.

Even if the agreements are still in force, the defendants persuasively argue that the non-compete provisions limit only ordinary competition and are, therefore, unenforceable as a matter of law. Certain interests, such as the need to protect confidential information, trade secrets, and good will, warrant the use of a covenant against competition. Boulanger, 815 N.E.2d at 578. Although the plaintiffs point to the Boulanger court's holding that the covenant not to compete was enforceable, the facts here are distinguishable. The plaintiff in Boulanger signed documents acknowledging the "proprietary and confidential nature of the information he was acquiring." Id. at 576. He had access to operating manuals, recipes, marketing and promotion strategies, new product development, and the locations of sites for new stores. Id. at 578.

There are no trade secrets involved here. The plaintiffs' best argument is that the defendants have the benefit of knowing RE/MAX general business strategies. Given the nature of the real estate brokerage business, however, there is reason to wonder whether any good will generated by the various offices is due to RE/MAX branding and methods or the work and personal relationships of the agents. At the very least, the record does not convincingly support the former possibility.

Even assuming that the plaintiffs have a likelihood of success on the merits, however, they have not shown that the prospect of harm that is irreparable in the necessary sense. That is, they have not shown the inadequacy of a damages remedy. See Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

### 2. Post-Termination Covenants

The plaintiffs argue that the three offices where franchise agreements have expired are bound by post-term non-compete covenants. Although the expired agreements did not contain any post-term covenant, the plaintiffs claim that §2.E of those agreements, dealing with holdover franchisees, bound the franchisees to terms introduced in newer versions of the standard franchise agreement, as they might evolve. Section 2.E states that, upon expiration, the franchise "will be deemed to be operating on a month-to-month basis under the terms and conditions of the franchise agreement and other agreements being used by us at the time of expiration of the Term, and from time-to-time thereafter . . . ."

If the plaintiffs are correct, then §14.1 of current agreements will apply to those three offices. The provision states:

> You agree that upon termination, expiration, or non-renewal of this Agreement, neither you nor your Owners . . . will, for a period of one (1) year from the effective date of such termination, expiration, or non-renewal . . . directly or indirectly operate, manage, own or have any ownership interest in any business that is a licensee or franchisee of any franchising organization or network that competes with [RE/MAX] . . .

There is substantial doubt that, if the provision applies to them, the three offices are in breach of it. Though they may be part of the Prestige "network," the offices are apparently simply places where Prestige conducts business. They are not franchisees or licensees of Prestige, nor of any other organization. The plaintiffs' interpretation of the provision is not the most natural. The word "network" is not to be read alone; rather, the plain and most natural reading is to treat that word as modified by "franchising." The provision is aimed at preventing former RE/MAX franchisees from becoming licensees or franchisees of a "franchising organization" or a "franchising network." LAER is not a licensee or franchisee of any franchising organization or network.

### C. Assignment of Phone Numbers and Domain Names

Sections 4.B and 14.B of the franchise agreements require the defendants, upon termination, to assign all telephone numbers and domain names to the plaintiffs. The defendants contend that RE/MAX never owned any of the telephone numbers because Prestige purchased them, and that, in any event, there is no risk of consumer confusion. It appears that the domain names have been deactivated and as to them injunctive relief is no longer necessary.

I agree with the defendants that success in the real estate industry is likely founded more on relationships between potential buyers and sellers, on the one hand, and individual agents and brokers, on the other. It is also likely that personal references from friends and acquaintances are a major source of new business. Given that, there is reason to suspect that the importance of telephone numbers in generating new business is less substantial than other factors. It is worth

noting that none of the phone number cases cited by the plaintiffs involved a real estate agency. In addition, most of the cases relied heavily on customer confusion. In Stanley Steemer Int'l, Inc. v. Hurley, 2013 WL 210733, at *2 (S.D. Ohio 2013), the former franchisee continued to use the franchise's name, logo, equipment, and vans. Customers had no real way of knowing that the defendant was no longer operating as Stanley Steemer, and the plaintiffs were able to introduce evidence that customers were genuinely confused. Similarly, the former franchisee in Two Men and a Truck/Int'l, Inc. v. Two Men and a Truck/Kalamazoo, Inc., 1995 WL 549278, at *7 (W.D. Mich. 1995), was ordered to transfer phone numbers only after the court found that there was a clear Lanham Act violation.

Here, with no real controversy about the use of the plaintiffs' trademarks and no evidence of customer confusion, an injunction is not in order.

### IV. Conclusion

With respect to the trademarks and the non-compete clauses, the plaintiffs have not adequately demonstrated their likelihood of success on the merits. Indeed, whether the plaintiffs will succeed depends on critical questions of fact, including: (1) were the defendants actually *using* the plaintiffs' trademarks; (2) were the franchise agreements in effect so that the in-term non-compete clauses applied; and (3) was the post-termination non-compete clause in the agreement and, if so, did the defendants violate it. These questions cannot be answered at this early stage of litigation.

While the likelihood of success for the plaintiffs on the phone numbers issue appears to be somewhat stronger due to the contract terms, the additional considerations that are taken into account when assessing the appropriateness of injunctive relief caution against granting the

plaintiffs' motion. It is doubtful whether the plaintiffs will suffer irreparable harm, or any harm at all, if the defendants fail to assign the phone numbers and domain names.

Taking the motion as a whole, the balance of the hardships and the public interest both weigh heavily in favor of the defendants. The defendants say they have already invested over $600,000 in their transition to the LAER brand. If enjoined, they would effectively have to go out of business. The defendants also point to the real estate customers, sales agents, and other employees who would be adversely affected by the granting of a temporary restraining order.

Because the likelihood of success on the merits is unclear and the balance of the hardships and public interest factors tend to favor the defendants, the plaintiffs' Motion (dkt. no. 13) for Temporary Restraining Order and Preliminary Injunction is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge